WILSON v. NEW YORK CONTRACTING CO., PENNSYLVANIA TERM-
INAL.

(Supreme Court, Appellate Division, First Department.  December 11, 1908.)

1. MASTER AND SERVANT (§ 124*)—DUTY TO FURNISH TOOLS AND INSPECT DE-
FECTS THEREIN.

It is the duty of an employer to use reasonable care to furnish em-
ployés with suitable tools and machinery and to keep them in repair, so
that the employés may not be exposed to unnecessary peril, which in-
cludes the duty of proper inspection to discover defects which may arise
from or during use.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 235;
Dec. Dig. § 124.*]

2. MASTER AND SERVANT (§ 286*)—INJURIES TO SERVANT—ACTIONS—QUESTIONS
FOR JURY.

While a servant, in an action against the master for injuries, must af-
firmatively show that the master's negligence was the sole cause of the
injury, it need not always be shown by direct and positive evidence, but
may be shown by circumstances from which the inference is fairly to be
drawn that the essential facts exist; and if from the circumstances
shown two inferences can be drawn, one supporting and the other destroy-
ing the cause of action, the question is for the jury.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 286.*]

3. APPEAL AND ERROR (§ 927*)—REVIEW—APPEAL FROM NONSUIT.

On appeal from a nonsuit, plaintiff is entitled to the benefit of the most
favorable inferences to be fairly drawn from the evidence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3748;
Dec. Dig. § 927.*]

4. MASTER AND SERVANT (§ 286*)—INJURY TO SERVANT—ACTIONS—QUESTION
FOR JURY.

In an action by a servant for injuries from being struck by an iron
brace bent outward on a pilot car used in carrying rock from an exca-
vation down an inclined railway, over which work the servant was fore-
man, whether the master had failed in the duty of inspecting the car be-
fore permitting it to be used held to be for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1029;
Dec. Dig. § 286.*]

Patterson, P. J., and Laughlin, J., dissenting.

Appeal from Trial Term, New York County.

Action by William Wilson against the New York Contracting Com-
pany, Pennsylvania Terminal.  Judgment of dismissal, and plaintiff
appeals.  Reversed, and new trial ordered.

Argued before PATTERSON, P. J., and McLAUGHLIN,
LAUGHLIN, HOUGHTON, and SCOTT, JJ.

M. L. Malevinsky, for appellant.
John Conway Toole, for respondent.

SCOTT, J.  The plaintiff appeals from a judgment entered upon
the dismissal of his complaint.  Plaintiff had been in defendants' em-
ploy from October, 1905, until April 6, 1906, the date on which he
was injured.  During all that period he was engaged in work incident
to the disposal by cars and boats of material which defendant was re-
moving from the site of the Pennsylvania Terminal Station in the city

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of New York. Prior to this employment he had worked for other companies doing like work and by similar methods.

The material (blasted rock) was being taken over to North river in work cars, and the smaller rocks were dumped down the chutes into waiting scows. For the first months of his employment Wilson was connected with this work. For two months prior to the accident he was engaged as foreman in charge of the work of loading onto scows the larger pieces of rock, big, jagged boulders, which could not be dumped down chutes, but must be handled singly by chains and hoisting machines, called "telphers." The cars containing these big pieces came over from the excavation by way of a trestle, which ran through West Thirty-Second street, at a considerable elevation above the curb level. The cars that held the rock were let down from the west end of this trestle to the river level by an inclined railway, about 300 feet long, that passed them down to a dock or platform 40 feet wide and 80 feet long. On the trestle, incline, and platform were two narrowguage railway tracks, 3 feet 6 inches apart. The work cars were let down the incline by a steel cable operated by an engine. The method was this: A steel cable was attached to one car, used as a "pilot car." The loaded cars were pushed to the edge of the incline, with the pilot car ahead. As the cable was let out, the loaded cars followed the pilot car down the incline. The cable attached to the pilot car passed back under the other cars and over a drum to the engine, and was let out by the engineer as the cars were thus let down the incline. The plaintiff, Wilson, was for two months prior to the accident the foreman in charge of the work of letting down and unloading the cars that came down onto the platform at the base of the incline. The platform was planked over between the tracks, at the side of the tracks, and south of the south track. It would appear that the space was all covered with planking.

The duty of the plaintiff was to be about this platform, directing his seven or more laborers, signaling for trains to come down, and superintending the unloading of the cars. This he did daily for two months; the trains making from 30 to 50 trips per day under his direction. Wilson claims that he was directed to stand between the tracks when he signaled trains, and it must be assumed on this appeal that he was so directed. The tracks were 3 feet 6 inches apart, and Wilson says he habitually stood between them. The pilot car concerned in this case was of the usual type of pilot car, being an ordinary flat car, of which many were in use in the excavation, with a wooden box loaded with stone on it to give it weight to hold the cars behind it. The car proper was of steel and wood construction, and had a flat top made of wood. Across this, and a short distance from each end of the platform, was a bolted steel brace, 2 to 2½ inches wide and one-half inch thick. These braces were bolted onto the platform of the car, and each end was turned up, so that they stood up from the platform like short cart stakes, and were apparently designed to hold the box on the car. These braces were on all the cars of the platform variety, and the only change that was necessary to fit the car for use as a pilot car was to put on it a box with stone to make it heavy. The box was a square wooden box, not smaller than a regular car box.

This box could be put on any platform car. The braces in their normal condition projected beyond the edge of the platform of the car 5 or 6 inches, and then turned up. They were braced from beneath by a brace welded or bolted to the upright; the brace being of steel. These braces, therefore, provided four upright pieces of steel, one approximately at each corner of the car. The obvious purpose of the braces was to hold on the car the box which was put on to hold the material that was being carried.

On the day of the accident plaintiff was standing near a shanty at the south side of the dock or flat space and 15 feet from the tracks, when the signalman at the head of the incline called to him that a train was ready. Right in front of Wilson was a platform, south of the south track, planked over, at least 4 feet wide and 20 feet long. Apparently the whole platform was planked over in front of the shanty. Wilson signaled to let the train come down, passed over between the tracks, and stood there with a stick in his hand to block the cars after they passed him. As the pilot car ranged alongside of him, he discovered that one of the lugs or braces was bent outward, and at the same instant the bent brace hit him on the leg, he was thrown under the moving cars, and the unfortunate injuries followed. Neither plaintiff nor Charnley, his witness, ever saw this car before, so far as is known. It does not appear that there was anything along the incline down which the train had come which would be likely to bend out the brace. It may therefore be inferred that it was bent out before the pilot car left the top of the incline. It further appeared that the pilot car was kept permanently loaded; that it did not run back to the excavation, where the other cars were loaded with rock, but that it was kept standing near the top of the incline, until the cars that had been loaded a considerable distance away were brought down to where it stood. It may be therefore also inferred that the iron brace was not bent outwards in the act of loading the car just before it made the trip on which plaintiff was injured. It also appeared very clearly that the defect would be perfectly apparent to any one looking at the car, and could not have failed to be discovered upon any careful inspection.

We think that there are two well settled principles applicable to this case which require a reversal of the judgment. The first is that it is the duty of an employer to use reasonable care to furnish his employés with suitable tools, appliances, and machinery in the first place, and to keep it in repair so that they may not be exposed to unnecessary peril. This includes the duty of proper inspection for the purpose of discovering defects which may arise from or during use. Bailey v. R., W. & O. R. R. Co., 139 N. Y. 304, 34 N. E. 918. The second principle is that, while it is incumbent upon the plaintiff to show affirmatively that the negligence of the defendant was the sole cause of the injury complained of, it is not essential that this shall always be shown by direct and positive evidence. The proofs may be indirect, and the evidence had by showing circumstances from which the inference is fairly to be drawn that the principal and essential facts exist. When, from the circumstances shown, inferences are to be drawn which are not certain and incontrovertible, and may be differently made

by different minds, it is for the jury to make them. Hart v. Hudson River Bridge Co., 80 N. Y. 662. It follows from this rule that if, from the evidence, two inferences can be drawn, one supporting and the other destroying the alleged cause of action, it is for the jury to say which of the two shall be drawn. Handy v. Met. St. Ry. Co., 70 App. Div. 29, 74 N. Y. Supp. 1079.

Of course, in considering an appeal from a nonsuit, the plaintiff is entitled to the benefit of the most favorable inferences to be fairly drawn from the evidence. We find a defect in a car unmistakably apparent upon an inspection. We find, also, evidence which seems to render it improbable that the injury causing the defect in the car could have been suffered either in the course of the trip down the incline or immediately before the descent was commenced. We think that under the circumstances, and upon the evidence as it stood when the complaint was dismissed, a question was presented for the determination of the jury whether or not the defendant had not failed in the duty of inspecting the pilot car before permitting it to be used.

The judgment must therefore be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur, except PATTERSON, P. J., and LAUGHLIN, J., who dissent.